THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| **TRUSTEES OF THE UTAH CARPENTERS' AND CEMENT MASONS' PENSION TRUST and UTAH CARPENTERS' AND CEMENT MASON'S PENSION TRUST,** )))) | Case No. **2:10-cv-00809-DS** |
| Plaintiffs, ) |  |
| vs. ) | MEMORANDUM DECISION |
| ) |  |
| **ELIZABETH LOVERIDGE, TRUSTEE FOR PERRY OLSEN DRYWALL, INC.; OKLAND CONSTRUCTION COMPANY, INC., a Utah Corporation; NEW STAR GENERAL CONTRACTORS, INC., a Utah Corporation; and CULP CONSTRUCTION COMPANY, a Utah Corporation,** ))))) |  |
| Defendants. ) |  |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The parties in the above-captioned matter have filed cross-motions for summary judgment in this claim brought under the Employee Retirement Income Security Act of 1974. For the reasons set forth below, the Court grants the Plaintiffs' motion in all respects, but reserves the question of whether the Arbitrator erred in failing to credit payments Defendants made toward its withdrawal liability until the Court receives additional information from the parties.

<u>Background</u>

Plaintiffs Trustees of the Utah Carpenters' and Cement Masons' Pension Trust ("Trustees") and Utah Carpenters' and Cement Masons' Pension Trust ("Plan") bring suit against Defendants under the Employee Retirement Income Security Act of 1974 (ERISA). Defendants in this action are Okland Construction Company, Inc., New Star General Contractors, Inc., and Culp Construction Company (sometimes referred to collectively as "ONC"), all Utah corporations with their principal places of business in Utah. Also a defendant in this action is Elizabeth Loveridge, trustee for Perry Olsen Drywall, Inc. ("POD"), formerly an Idaho corporation with its principal place of business in Salt Lake City, Utah (together, "Employers"). The Employers (with the exception of POD post-bankruptcy) are general contractors in the building and construction industry, and each until 2003 had separate labor contracts with the Rocky Mountain Regional Council of Carpenters (later subsumed by the Southwest Regional Council of Carpenters), affiliated with the United Brotherhood of Carpenters and Joiners of America ("Union") to provide for contributions to the Plan for employee pension benefits.

The following facts were found during arbitration proceedings, and are materially undisputed. The Plan is a Taft-Hartley trust fund established in 1963 with a joint labor-management board of trustees formed in accordance with 29 U.S.C. 186(c)(5). (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 4, Dec. 28, 2011, ECF No. 57-1.) Accordingly, two employees, one from Okland and the other from New Star, sat as Trustees of the Plan. (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 4.) The Plan further adheres to ERISA's prohibited transaction rules and collection policies, under which all delinquent employers must pay, in addition to the delinquent contributions, interest, attorney fees, and liquidated damages on late contributions. (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 5.)

The 2002 Winter Olympic Games held in Salt Lake City caused an upswing in the local construction business and a corresponding increase in the number of participants enrolled in the Plan. (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 5.) A short time later, a decrease in that construction and stagnant interest rates on investments caused the Plan's unfunded vested benefit ("UVB") liability to skyrocket to approximately $7.4 million. (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 5.) At a Plan meeting on July 11, 2003, Okland, in response to the new UVB liability information, discussed withdrawal liability and wished to know whether the Utah Plan

could be merged with the Southwest Regional Council of Carpenters ("SWRCC") Plan.[1] The Trustee Secretary (recently appointed to the board by SWRCC) informed Okland that the Utah Plan's UVB liability rendered a merger unlikely. (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 6.) To facilitate the merger, SWRCC in December 2003 proposed that the Employers divert the majority of their contributions to the SWRCC Plan and continue making a token contribution of $.10 per employee hour worked "to the Utah fund to prevent a termination of the Plan and a triggering of unfunded liability." (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 7-8.)

At another meeting on February 4, 2004, the Trustees received an actuarial report that found the hourly contributions needed to amortize the Plan's UB liability over 15 years would be $.52 per hour. (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 8.) At the same meeting, Okland's representative said that the $.10 payments would likely cause the Employers to incur withdrawal liability under the "evade and avoid" provision of ERISA, 29 U.S.C. § 1392(c), but that the Employers could alternatively pay $.52 per hour "to avoid withdrawal liability." (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 8.) Thus, in place of the $.10 agreements, the Employers and Trustees added section 3.02(e) ("Amendment 5") to the Plan to allow the Employers to pay contributions to the Plan of $.52 per hour—not to accrue employee benefits, but solely for the purpose of reducing the Plan's UVB liability.[2] Notably, the largest employers at the time of the adoption of Amendment 5 were the Employers in this case; they also were the participating employers who would have incurred the most substantial withdrawal liability without the adoption of Amendment 5. (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 8.)

Thereafter, tension continued to mount between the Plan and the Employers. This tension culminated in, among other events, Okland and New Star forming labor agreements with and offering support for a newly-formed United Carpenters Association labor union ("UCA"), New

---

[1] Withdrawal liability was an issue at the July 11, 2003 meeting because POD had at some time prior failed to negotiate a new labor agreement with the Union, subsequently withdrew its voluntary recognition of the Union, and ceased making contributions to the Plan. Pursuant to 29 U.S.C. § 1382, the Plan's attorney presented POD with notice of a withdrawal liability assessment in the amount of $965,111. (POD's Mem. in Supp. of Mot. for S.J. 9, Dec. 28, 2011, ECF No. 57.)

[2] Amendment 5 states, in pertinent part:

§ **3.02  Regular Pension—Amount**
(e) On and after April 1, 2004, no benefit will be earned for hours in Covered Employment for an Employer contributing at a rate of $.52 per hour or less for such hours. (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 8.)

Star forming labor agreements with a non-Plan painters' union, SWRCC filing suit against the UCA before the NLRB, the resignation of the Plan's counsel and accountants, and the Department of Labor launching a formal investigation into the matter in late 2005 or early 2006, which investigation remains open. (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 9-13.) During plans to increase the minimum required hourly contribution from $.52 to $.97 per hour during February 2006, the Plan directed its new counsel to investigate the Employers' actions and pursue withdrawal liability. The Plan, through its new counsel, issued initial withdrawal liability assessments to New Star and Okland on June 28, 2006, and to POD and Culp on July 3, 2006, contending that all four Employers had withdrawn from the Plan after adopting Amendment 5 in 2004. (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 13.)

The Employers requested arbitration soon thereafter, and Arbitrator Norman Brand ("Arbitrator") bifurcated the proceedings into two phases, the first for liability, and the second to determine damages. (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 25.)  From those proceedings came five interim awards and one final award. Of relevance is the First Interim Award, in which the Arbitrator determined that (1) the Employers' agreements to pay a minimum contribution of $.52 per hour "ha[d] a principal purpose to evade or avoid withdrawal liability" under 29 U.S.C. § 1392(c); (2) the Employers' contributions were "installment payment[s] of withdrawal liability and did not create an 'obligation to contribute'" within the meaning of § 1392; (3) the Plan was entitled to disregard those payments under § 1392(c); and (4) that the Plan was entitled to attorney's fees and costs. (See POD's Mem. in Supp. of Mot. for S.J., Ex. 1.)  Also relevant is the Fourth Interim Award, in which the Arbitrator ruled that the Employers were not entitled to a refund of the $.52 per hour contributions, nor were those payments creditable against the amount of withdrawal liability owed. (See POD's Mem. in Supp. of Mot. for S.J., Ex. 4, at 39-40, Dec. 28, 2011, ECF No. 57-4.) Lastly, in his Final Award, the Arbitrator incorporated the five interim awards and awarded the Plan attorneys' fees, costs, and arbitration expenses, payable equally by the four Employers. (See POD's Mem. in Supp. of Mot. for S.J., Ex. 5, at 4-5, Dec. 28, 2011, ECF No. 57-5.)

The Plan, POD, and ONC have all filed cross-motions for summary judgment. ONC's and POD's respective motions overlap to a large degree, and they move the Court to find that the Arbitrator erred as a matter of law by (1) determining that the Employers had withdrawn from

the plan by making payments with a principal purpose to "evade or avoid" withdrawal liability as described in 29 U.S.C. § 1392(c); (2) attributing the behavior of the Trustees to the Employers themselves; and (3) in the alternative, by refusing to credit the Employers' $.52 per hour contributions against their withdrawal liability and by awarding attorney's fees. POD also seeks an award of its own attorney's fees and costs. The Plan's motion asks that this Court uphold all of the Arbitrator's findings as legally and factually accurate. The Court grants the Plan's motion for summary judgment and denies the Employers' motions in all respects, but withholds a ruling on whether the Arbitrator erred in failing to credit the Employers for payment of withdrawal liability.

## Jurisdiction & Venue

This Court has jurisdiction over this matter pursuant to 29 U.S.C. § 1451(c) and 28 U.S.C. § 1331. Venue is proper as the suit is "brought in the district where the plan is administered or where a defendant resides or does business." Id. § 1451(d).

## Summary Judgment Standard

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering the summary judgment motions, the Court must examine "the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." Berry & Murphy, P.C. v. Carolina Cas. Ins. Co., 586 F.3d 803, 808 (10th Cir. 2009). Furthermore, "an issue of fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue. An issue of fact is material 'if under the substantive law it is essential to the proper disposition of the claim.'" Adler v. Wal–Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir .1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). As the parties have filed cross-motions for summary judgment, the Court enters judgment accordingly.

Standard of Review

      This case requires the Court to decide whether the Arbitrator erred as a matter of law in finding that the Employers withdrew from the Plan and incurred withdrawal liability thereby. ERISA provides that "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct," applying the clearly erroneous standard. 29 U.S.C. §§ 1401(a)(3)(A), 1401(c) (2006). Normally, then, the scope of judicial review provided for in § 1401 is quite narrow, given the statutory language as well as ERISA's "strong policy favoring arbitration of withdrawal liability disputes." Sherwin-Williams Co. v. New York State Teamsters Conference Pension, 158 F.3d 387, 392 (6th Cir. 1998) (citing Mason & Dixon Tank Lines, Inc. v. Central States Pension Fund, 852 F.2d 156, 163-64 (6th Cir.1988)).

      However, contrary to the Plan's assertions, the question presented does not warrant application of the clearly erroneous standard. The Supreme Court has distinguished "mere question[s] of fact," to which § 1401(a)(3)(A) would apply, from the question of "whether [the] facts amount to a 'complete withdrawal,'" as described in 29 U.S.C. § 1383(a). Concrete Pipe, 508 U.S. at 630. The question of whether a complete withdrawal occurred—the question presented in this case—is not a "mere question of fact," but rather, "one of law."[3] Id. Because questions of law are reviewed de novo, see In re Amarex v. Temex Energy Inc., 853 F.2d 1526, 1529 (10th Cir. 1988), the Court applies that standard to review the Arbitrator's findings as to that question. However, as questions of fact are committed to his discretion, the Court applies the clearly erroneous standard to the Arbitrator's other findings.

---

[3] Nor is the question a mixed question of law and fact. In Concrete Pipe, the Court characterized the question of the *date* of complete withdrawal as a mixed question of law and fact, while it distinguished the question of whether complete withdrawal occurred as purely legal. 508 U.S. at 630. Had the Court not characterized the latter question as "one of law," it may have been considered a mixed question involving a primarily factual inquiry, to which the clearly erroneous standard would apply. See Estate of Holl v. C.I.R., 54 F.3d 648, 650 (10th Cir. 1995). However, in light of the Court's language to the contrary, de novo review is appropriate.

<u>Discussion</u>

*A. Relevant Legislative History*

Congress enacted ERISA in 1974 to establish minimum standards for pension plans in private industry. However, one of ERISA's weaknesses was that it imposed only minimal liability on employers who decided to withdraw from financially distressed plans with high UVB liability, essentially leaving employees unable to collect on their earned benefits. <u>Joint Explanation of S. 1076: Multiemployer Pension Plan Amendments Act of 1980</u>, 126 Cong. Rec. 20191-2. In response, Congress amended ERISA by passing the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA). Among other things, the MPPAA "made employers, unless relieved by special provisions, liable for their share of unfunded plan benefits when they withdrew from [multiemployer pension] plans . . . . serv[ing] to discourage withdrawals and the shifting of liabilities to the program." <u>Id.</u> Besides encouraging employers to merely remain in benefit plans, one of the MPPAA's major purposes was to discourage employers from taking *any* action that would threaten to render multiemployer pension plans insolvent. <u>See</u> <u>Cuyamaca Meats, Inc. v. San Diego and Imperial Counties Butchers' and Food Employers' Pension Trust Fund</u>, 827 F.2d 491, 496 (9th Cir. 1987) (citing <u>Board of Trustees v. Thompson Bldg. Materials, Inc.</u>, 749 F.2d 1396, 1401–02 (9th Cir. 1984)).  The MPPAA's imposition of liability on employers who withdraw from pension plans carries out these legislative purposes. <u>Id.</u>

*B. Withdrawal Liability*

The Employers first argue that the Arbitrator erred as a matter of law when he determined that their actions constituted complete withdrawal under the MPPAA. This requires the Court to answer two separate, but related, questions: first, whether an employer can, under the MPPAA and pursuant to an ostensibly valid labor agreement, remain "in plan," yet still statutorily "withdraw"; and second, whether the Employers' actions in this case warranted a finding that they in fact withdrew from the Plan. The Court answers both questions in the affirmative.

*1. May a bargaining agreement constitute "any transaction" under 29 U.S.C. § 1392?*

The Court first disposes of the question of whether "any transaction" under § 1392(c) can include an employer's joint labor agreement with a union. The MPPAA imposes withdrawal

liability on an employer if the employer completely or partially withdraws from a multiemployer pension plan with UVB liability.[4] The amount of withdrawal liability incurred is determined using a complex formula, but essentially requires a withdrawing employer to pay a pro rata share of any outstanding UVB liability at the time of withdrawal. 29 U.S.C. § 1381(b)(1). Under the MPPAA, "a complete withdrawal . . . occurs when an employer (1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." Id. § 1383(a). For an employer in the building and construction industry, complete withdrawal may also occur if an employer ceases its obligation to contribute and the employer continues working in the industry. Id. § 1383(b)(2). The MPPAA further defines "obligation to contribute" as an obligation that arises "under one or more collective bargaining (or related) agreements." Id. § 1392(a)(1). Finally, and primarily at issue in this case, the MPPAA's "evade and avoid" rule provides that "[i]f a principal purpose of *any* transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction." Id. at §1392(c) (emphasis added).

As with all questions of interpretation, the Court begins with the plain meaning of the statute. Resolution Trust Corp. v. Connor, 817 F. Supp. 98, 100 (W.D. Okla. 1993) ("The starting point for interpretation of a statute is the language of the statute itself.") (quoting Kaiser Aluminum & Chemical Corp. v. Bonjorno, 494 U.S. 827, 835 (1990)). "If the language of a statute is clear and unambiguous, then the Court's inquiry ends and the plain meaning of the language is conclusive except in the rare instance where 'literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters,'" id. (quoting United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989)), or if "patently absurd consequences" would result from the plain meaning interpretation, id. (quoting United States v. Brown, 333 U.S. 18, 27 (1948)). The statute is clear and unambiguous and must therefore be accorded its plain meaning. In wording the statute, Congress chose perhaps the least restrictive term it could have to describe what actions could rise to the level of a complete withdrawal: "any." Used in this ordinary context, there is on the face of § 1392 no apparent reason why Congress would use such all-encompassing language, yet exclude transactions involving labor

---

[4] "If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability." 29 U.S.C. § 1381(a) (2006). Section 1385 governs partial withdrawal liability. However, no analysis of that provision is necessary because the Plan seeks summary judgment on the grounds of complete withdrawal.

unions. See also SUPERVALU, Inc. v. Bd. of Trustees of Sw. Pennsylvania & W. Maryland Area Teamsters & Employers Pension Fund, 500 F.3d 334, 339 (3d Cir. 2007) (holding that an arbitrator's finding of withdrawal liability pursuant to a collective bargaining agreement "fits squarely within the plain language of" § 1392(c)). In short, "any transaction" means just that, and does not exclude collective bargaining agreements akin to the type the Employers entered into.

The Employers attempt to persuade the Court to disregard the plain text by arguing that Amendment 5 did not violate § 1392(c) because "it in no way frustrated the purposes of the MPPAA." See Cuyamaca Meats, 827 F.2d at 499. However, even if the Court were to cast aside the plain language of the statute in favor of the Employers' interpretation, their arguments still do not persuade the Court that the Employers did not violate § 1392. The Employers' arguments rely almost entirely on Cuyamaca Meats. In that case, an employer timed its withdrawal to avoid incurring an additional $1 million in withdrawal liability. Id. at 494. However, the court found that, although "motivated, at least in part, by a desire to minimize withdrawal liability," the employer's actions did not "frustrate the purposes of the MPPAA" because they had "economic substance" and constituted a "bona fide, arm's length transaction" with a labor union. Id. at 499. The Employers' rationale is essentially the same: because Amendment 5 was mutually agreed upon by the Employers and the Union, it created an obligation to contribute which does not frustrate the purpose of the MPPAA because they remained "in plan."

However, the Court declines to adopt this interpretation. First, Cuyamaca Meats is, as the Arbitrator put it, "weak precedent." Besides being an older case relative to other case law interpreting the same statutory provision, it flouts more usual methods of statutory interpretation by looking beyond the plain language of the statute and failing to accord the terms therein their ordinary meaning. Relatedly, Cuyamaca Meats is apparently the only case to hold as it did. The Court finds the ample body of more recent case law that accords the statutory language its plain meaning to be more persuasive. See, e.g., SUPERVALU, Inc., 500 F.3d 334 (3d Cir. 2007); Sherwin-Williams Co. v. N.Y. State Teamsters Conference Pension & Ret. Fund, 158 F.3d 387 (6th Cir. 1998); Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Exp., Inc., 999 F. Supp. 1153, 1163-64 (N.D. Ill. 1998).

Second, the Employer's interpretation of the statute's purpose is, given its legislative history, too narrow to govern the Court's decision. The MPPAA's purpose is not merely to

encourage employers to remain "in plan," as the Employers suggest. Rather, it is to discourage *any* transaction—including forming a collective bargaining agreement with a labor union and a subsequent "obligation to contribute"—that might serve to harm the financial viability of a pension plan. See SUPERVALU, Inc., 500 F.3d at 336 (MPPAA "designed to prevent employers from . . . threatening the solvency of [multiemployer pension] plans"); Cuyamaca Meats, 827 F.2d at 496 (MPPAA's purpose was to ensure that employers would not take action to render plans insolvent); Central States, Southeast and Southwest Areas Pension Fund, 999 F. Supp. at 1163-64; (citing Central States Southeast and Southwest Areas Pension Fund v. Bellmont Trucking Co., Inc., 788 F.2d 428, 433 (7th Cir. 1986)). Though the Employers rely on the fact that the Plan's UVB liability decreased after adopting Amendment 5, the statute on its face does not contemplate such a result. Rather, it asks only whether "any transaction" had a principal purpose to evade or avoid withdrawal liability. In light of the plain text and history of the relevant provisions of the MPPAA, the Employers cannot escape the consequences of § 1392 merely by arguing that their actions did not "frustrate the purpose of the statute." Thus, the Arbitrator was correct in his interpretation that a collective bargaining agreement between a union and an employer may fall under the "any transaction" language of § 1392's "evade and avoid" provision.[1]

## 2. Did the Employers in fact withdraw under MPPAA?

Having established that the Employers' bargaining agreement can constitute statutory withdrawal, the Court next decides whether the Arbitrator erred in finding that the Employers had "a principal purpose" to "evade or avoid" withdrawal liability. Trying to evade or avoid liability "needn't be the *only* purpose" under § 1392(c). See Santa Fe Pacific Corp. v. Central States, Southeast and Southwest Areas Pension Fund, 22 F.3d 725, 727 (7th Cir. 1994) (emphasis added). Rather, avoidance of withdrawal liability, as *a* principal purpose, "need only have been one of the factors that weighed heavily in the [Employers'] thinking." Id.

---

[1] ONC's supplemental briefing does not sway the Court's decision. ONC cites *Shelter Distribution, Inc. v. General Drivers, Warehousemen & Helpers Local Union No. 89*, 674 F.3d 608 (6th Cir. 2012), for the proposition that a collective bargaining agreement with a union to indemnify employers for withdrawal liability is not contrary to public policy. However, the question in the instant case—whether an agreement between a union and an employer can be "any transaction" under 1392(c)—is different in kind. *Shelter Distribution* is therefore unpersuasive.

The Court finds that the Arbitrator did not err when he determined that one of the Employers' principal purposes was to evade or avoid withdraw liability. Based on an application of the preponderance of the evidence standard delineated in 29 U.S.C. § 1401(a)(3)(A), "[t]here can be no serious doubt" that avoiding withdrawal liability was "one of the [Employers'] principal considerations" in their decision to adopt Amendment 5. Santa Fe Pacific Corp., 22 F.3d at 728. Perhaps the clearest evidence comes from the explicit statements of some of the Employers that they intended to avoid withdrawal liability. For example, after POD withdrew its recognition of the Union in 2003, POD stated that it "would never have agreed" to enter the $.10 agreement except to make "the unfunded liability issues . . . go away." (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 35.) During the same period, Okland discussed merging the Plan with the SWRCC pension plan, during which withdrawal liability was a major issue of conversation and concern. (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 36-37.) Okland likewise expressed its reasoning for adopting Amendment 5, saying that because the $.10 agreement "constitutes a withdrawal liability . . . the Contractors are either assessed a withdrawal liability or are asked to pay the $.52 an hour into this Fund to avoid withdrawal liability." (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 8.) Similarly, Culp recognized the "potential for a large unfunded liability" at the time the $.52 agreement was created, and extended its collective bargaining agreement "in order to avoid that issue . . . ." (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 38.)

If outright statements are insufficient, the Employers' behavior also supports the Arbitrator's findings. Some of the Employers originally intended to divert their payments to the SWRCC plan, yet continued to make token $.10 payments to the Plan—payments which increased to $.52 only after being told that the $.10 payments would cause them to incur withdrawal liability. (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 6-7.) Okland and New Star also engaged in "negotiations" with the UCA, a new "union" formed outside ERISA's parameters.[5] (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 9-10.) When these negotiations were undermined, New Star also attempted to make a labor agreement with the painters' union as a substitute for its participation in the Plan, again in an apparent effort to avoid withdrawal

---

[5] Tellingly, the only representatives of the UCA were employees of Okland and New Star. The UCA also had no physical location, address, or telephone number by which one could verify the authenticity of those negotiations or communications. (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 9-10.)

liability. (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 10-11.) Likewise, Amendment 5 on its face was not intended to allow the $.52 payments to accrue benefits; rather, those payments would go toward reducing UVB liability only. Interestingly, these four Employers (plus another not a party to this lawsuit) were the only Plan employers paying at this lower rate, and would have been subject to the greatest withdrawal liability had they left the plan with UVB liability outstanding.

It is clear that, based on the Employers' express statements and behaviors, the Arbitrator did not err in finding that one of the Employers' principal purposes was to evade or avoid withdrawal liability within the meaning of § 1392. The Employers cannot realistically argue that the actions of the Trustees are not attributable to them. The actions of the particular Trustees in question were employees of New Star and Okland. Because of this, it seems that these Trustees would be *better* informed as to what consequences their actions would have. And based on the above-mentioned evidence, it indeed appears that all the Employers knew exactly what might happen in adopting either the $.10 agreement or Amendment 5. To hold otherwise would be a technical or artificial method of permitting the Employers to absolve themselves of withdrawal liability, which they unquestionably incurred in this case.

### C. Attorneys' Fees and Costs

The Court next turns to the issue of whether the Arbitrator erred in granting attorneys' fees and costs. The regulations set forth by the Pension Benefit Guarantee Corporation (PBCG) govern the allocation of costs and attorneys' fees in MPPAA arbitration claims. See 29 C.F.R. § 4221.14. Although ERISA's standards and the PBCG regulations normally grant an arbitrator broad discretion in determining the scope of such an award, see 29 U.S.C. § 1401 (2006); 29 C.F.R. § 4221.14, they limit that discretion in the withdrawal liability context. The rule provides:

> The costs of arbitration under this part shall be borne by the parties as follows:
>
> (a) *Witnesses*. Each party to the dispute shall bear the costs of its own witnesses.
>
> (b) *Other costs of arbitration*. Except as provided in § 4221.6(d) with respect to a transcript of the hearing, the parties shall bear the other costs of the arbitration proceedings equally unless the arbitrator determines otherwise. The parties may, however, agree to a different allocation of costs if their agreement is entered into after the employer has received notice of the plan's assessment of withdrawal liability.

(c) *Attorneys' fees*. The arbitrator may require a party that initiates or contests arbitration in bad faith or engages in dilatory, harassing, or other improper conduct during the course of the arbitration to pay reasonable attorneys' fees of other parties.

29 C.F.R. § 4221.10. Thus, although an arbitrator has broad discretion in awarding "other costs of arbitration," an arbitrator cannot award attorneys' fees except for "initiat[ing] or contest[ing] arbitration in bad faith" or for "other improper conduct" as described in § 4221.10.

Applying the clearly erroneous standard to the Arbitrator's decision, the Court holds that the Arbitrator ultimately did not err in apportioning and awarding attorneys' fees. The Plan does not assert that the Employers initiated arbitration in bad faith; the Arbitrator in his First Interim Award recognized that "the employers initiated arbitration" and did not act in bad faith in so doing. (POD's Mem. in Supp. of Mot. for S.J., Ex. 1, at 2.) Rather, the Employers contend that the Arbitrator erred in finding that they "contest[ed] arbitration in bad faith." However, the Court need not address that issue here because, even if that finding was incorrect, the Arbitrator also relied on an alternative ground for awarding fees: that the Employers engaged in improper conduct during the course of arbitration. To support that finding, the Arbitrator cited numerous behaviors, mannerisms, statements, and actions from Employers' witnesses, all of which the Arbitrator himself either heard or observed, to show that the Employers' conduct during arbitration was improper. (POD's Mem. in Supp. of Mot. for S.J., Ex. 2, at 8-24.) When an arbitrator engages in fact-intensive inquiry, such as deciding whether a party has engaged in improper conduct, the Court refrains overturning findings except for clear error, as the arbitrator "is by far best-situated to assess these myriad [facts] and determine whether" such an event occurred. See United States v. Mejia-Canales, 467 F.3d 1280, 1284 n.3 (10th Cir. 2006) (quoting United States v. Lancaster, 6 F.3d 208, 210 (4th Cir.1993)).

ONC cites one case dealing with Rule 11 sanctions to argue that an award based on both bad faith and improper conduct is necessarily tainted because it becomes "impossible to determine whether the latter violation, by itself, would have resulted in an award of attorney fees." See Business Guides, Inc. v. Chromatic Communications Ent., Inc., 892 F.2d 802, 814 (9th Cir. 1989), aff'd, 498 U.S. 533 (1991). Although there is "almost no case law as to awards of attorney fees as sanctions under 29 C.F.R. § 4221.10(c)," ONC likewise makes little effort to

analogize that case to the case at bar. (See ONC's Mem. in Supp. of Mot. for S.J. 36-37 n.55, Dec. 28, 2011, ECF No. 59.) The Court likewise declines to do so. Rather, it appears that the question of whether the Arbitrator erred in finding the Employers contested arbitration "in bad faith" need not be answered; ample evidence from his first-hand perceptions supports a finding of improper conduct and subsequent award of attorneys' fees.[6]

### D. Credit for Payment of Withdrawal Liability

Finally, the Employers argue that the Arbitrator erred in failing to credit payments they made under Amendment 5 toward the withdrawal liability they incurred. This issue needs additional explanation, as no party has provided an adequate basis upon which the Court can rest its decision. The Arbitrator distinguished "*installment* payments of withdrawal liability," which the $.52 payments were found to be, from "payments of withdrawal liability," the language used in 29 U.S.C. § 1392. (POD's Mem. in Supp. of Mot. for S.J., Ex. 4, at 15-16.) He also found that, even if the $.52 contributions fall within the precise statutory definition, they do not technically qualify because "they were never made pursuant to any schedule for liability payments established by the Plan," as required by § 1401(b)(1). (POD's Mem. in Supp. of Mot. for S.J., Ex. 4, at 6, 15-16.) Finally, the Arbitrator found that because ERISA "confers no jurisdiction on an arbitrator to consider whether [the Employers] are entitled to a credit in this arbitration for a payment the Plan accepted when [they] had no obligation to contribute" under § 1392, it was not within his purview to credit the payments toward the Employers' withdrawal liability. (See POD's Mem. in Supp. of Mot. for S.J., Ex. 4, at 6-7.)

Thus, although the Employers have paid money to the Plan, the money has not been credited toward anything—withdrawal liability or otherwise. Besides fundamental fairness issues, this situation also raises questions that warrant additional briefing, namely: (1) whether there is a material difference between "installment payments of withdrawal liability" and "payments of withdrawal liability" under the relevant provisions of ERISA; (2) if not, whether a payment schedule is absolutely required under ERISA for a payment to count toward withdrawal liability; and (3) whether crediting payments of withdrawal liability falls within the Arbitrator's

---

[6] Accordingly, it was also within the Arbitrator's discretion to award the Plan its attorneys' fees and to deny the Employers their respective fees. The Court therefore declines to alter the Arbitrator's decision and denies POD its request for attorneys' fees.

jurisdiction at all. Because these questions are not sufficiently addressed in the briefing at present, the Court directs counsel to contact the Court and schedule a telephone conference to discuss resolution of this issue and the possible need for more information before it can render a decision on that particular issue.

Conclusion

Thus, the Court grants the Plan's cross-motion for summary judgment on the grounds that a collective bargaining agreement can constitute "any transaction" for withdrawal liability purposes within the plain meaning of 29 U.S.C. § 1392(c); that the Employers' in fact incurred withdrawal liability by adopting Amendment 5 with "a principal purpose" to "evade or avoid" that liability; and that the Arbitrator did not err in awarding the Plan its attorneys' fees and costs pursuant to 29 C.F.R. § 4221.10. However, the Court reserves the question of whether the Arbitrator erred in failing to credit the Employers' payments toward their withdrawal liability until it receives additional information from the parties.


SO ORDERED.

DATED this 27th day of June , 2012.


BY THE COURT:


_____
DAVID SAM
SENIOR JUDGE
UNITED STATES DISTRICT COURT